597 So.2d 1136 (1992)
PREMIER BANK, NATIONAL ASSOCIATION
v.
PREVOST MOTORS, INC.
No. CA 91 0173.
Court of Appeal of Louisiana, First Circuit.
April 10, 1992.
Rehearing Denied May 28, 1992.
*1137 A. Michael Dufilho, Baton Rouge, for plaintiff-appellee Premier Bank, NA.
A. Edward Hardin, Baton Rouge, for intervenor Generla Elec. Capital Commercial Automotive Finance, Inc.
James M. Garner, Rudy J. Cerone, New Orleans.
J. David Forsyth, New Orleans, for defendant-appellee Volkswagen of America.
William H. Patrick, Baton Rouge, for Prevost Motors.
Before COVINGTON, C.J., and LeBLANC and WHIPPLE, JJ.
WHIPPLE, Judge.
This case involves the ranking of two collateral chattel mortgages to secure future advances executed by Prevost Motors, Incorporated (Prevost). Both mortgages encumbered the same inventory of motor vehicles, parts and accessories and were originally pledged to Louisiana National Bank (LNB) and to Borg-Warner Acceptance Corporation (Borg-Warner). The LNB mortgage had been filed and recorded with the Louisiana Department of Public Safety first and was held by the foreclosing creditor, Premier Bank, National Association (Premier), LNB's successor in interest. The other mortgage was held by intervenor, General Electric Capital Commercial Automotive Finance, Inc. (GECCAF), who seeks priority ranking by virtue of two acts of partial subordination. At issue is whether future advances by GECCAF were secured under the collateral chattel mortgage acquired by GECCAF from Borg-Warner and whether that mortgage primes Premier's under the subordination agreements.

FACTS AND PROCEDURAL HISTORY
On September 22, 1987, Prevost executed a collateral chattel mortgage note and mortgage on its entire inventory of new and used motor vehicles and parts in the amount of $3,500,000. Prevost pledged the note to LNB to secure repayment of its indebtedness to LNB. The mortgage was duly recorded with the Louisiana Department of Public Safety and Corrections in accordance with existing law.[1]
On January 11, 1988, Borg-Warner Acceptance Corporation changed its name to Transamerica Commercial Finance Corporation (Transamerica). Also, the parent corporation, known as Transamerica Commercial Finance Corporation, I, purchased Borg-Warner Acceptance Corporation's parent corporation, BWAC, and Borg-Warner continued its existence as Transamerica Commercial Finance Corporation, part of the parent Transamerica's Auto Finance Division and continued to make loans to Prevost as Transamerica.
On January 15, 1988, Prevost executed another collateral chattel mortgage note and mortgage on the same collateral, this time in the amount of $4,000,000. Prevost pledged this note to Borg-Warner to secure the repayment of Prevost's indebtedness to Borg-Warner. This mortgage was also duly recorded.
Both Premier and Borg-Warner were financing sources for Prevost Motors, Inc. However, Borg-Warner initially financed only new Volvos but later financed new Daihatsus as well. Premier financed all makes and models, new and used, except new Daihatsus. Because Premier possessed a higher ranking mortgage, Borg-Warner *1138 was required to obtain two agreements from Premier partially subordinating Premier's mortgage in favor of Borg-Warner's, to grant Borg-Warner a first priority lien on the vehicles that it financed.[2]
The first of the two acts of partial subordination was also executed on January 15, 1988. In the act, LNB agreed to subordinate its September 22, 1987 mortgage (among other mortgages) to Borg-Warner's mortgage, but only insofar as it pertained to new Volvo automobiles, parts and accessories.
The second act of partial subordination was executed by Premier on December 2, 1988, and similarly subordinated Premier's (formerly LNB's) mortgage in favor of Borg-Warner's mortgage. The terms of the second act of partial subordination limited it's effect to new Daihatsu vehicles, parts and accessories financed by Borg-Warner, which by then was known as Transamerica Commercial Finance Corporation (Transamerica). Both acts were duly recorded.
Transamerica then restructured its Auto Finance Division by transferring assets to new corporate entities by general bills of sale and assignment. According to the testimony of Jack Wacek, vice president of Transamerica, the Auto Finance Division was separately incorporated and its assets, including those constituting Borg-Warner Acceptance Corporation, were transferred by general bills of sale and assignment to an entity known as BW Twenty-Six and then to BWAC Sub-Three. Both transactions occurred on October 17, 1988.
The purpose of the restructuring was to separate Transamerica's auto finance operations from its corporate structure to repackage these business entities for subsequent sale. Transamerica desired to get out of the wholesale auto finance business and accordingly, collected the assets that it wished to sell into a discrete legal entity, which was named BWAC Sub-Three.
This entity consisted of Transamerica's Auto Finance Division, which was a portfolio of wholesale auto finance operations, including what was once Borg-Warner. On October 29, 1988, BWAC Sub-Three was renamed Transamerica Automotive Finance Corporation (TAFC) as distinguished from Transamerica Commercial Finance Corporation. General Electric Capital Corporation (GECC) then bought TAFC on June 1, 1989, and on September 1, 1989, renamed it GECCAF.
During this time, Prevost developed financial problems and had resorted to a scheme whereby it was able to double finance its Volvo inventory. Prevost soon defaulted on its obligations to Premier and Borg-Warner.
On May 1, 1990, Premier filed a petition for executory process alleging a secured indebtedness of $2,273,692.74, exclusive of interest and attorney's fees, and seeking to enforce both its 1987 mortgage and a subsequent mortgage, which was confected in 1989. A writ of seizure and sale issued the same day.
On May 24, 1990, GECCAF filed a petition of intervention alleging a secured indebtedness of $1,891,976.90, plus interest, and seeking to have its mortgage recognized and ranked as superior to Premier's mortgages.[3] Premier then filed a rule to show cause why it should not be recognized as possessing a superior mortgage.[4] The trial court received evidence and testimony on the rule on July 22 and 25, 1990, and signed a judgment in the matter on July 27, 1990.
The judgment denied GECCAF's petition of intervention insofar as it related to any collateral except those new Volvo and Daihatsu vehicles financed by Borg-Warner on *1139 or before October 17, 1988, the date on which the assets and liabilities of the Auto Finance Division, including those of BWAC were transferred by general bill of sale and assignment to a new corporate entity. The trial court did not issue separate written reasons for judgment. GECCAF appeals from the judgment, urging two assignments of error.[5]
In its first assignment, GECCAF contends the trial court erred in holding that loan advances made by GECCAF to Prevost after October 17, 1988 were unsecured.[6] Appellant also contends the trial court erred in finding that GECCAF was not entitled to successor rights under the subordination agreements.
The issues presented for our review are whether GECCAF is entitled to a secured position by virtue of the January 15, 1988 collateral chattel mortgage and pledge agreement in favor of Borg-Warner and whether the acts of partial subordination entitle GECCAF to priority ranking for its advances.

DISCUSSION
In a contest involving the ranking of mortgages, each claimant has the burden of proving the effective date of his mortgage as to third persons. Texas Bank of Beaumont v. Bozorg, 457 So.2d 667, 672 (La.1984). As noted in Bozorg:
The 1952 amendment to Article 3158 was designed to permit the mortgagor to pledge a collateral mortgage note to secure a particular debt, either previously existing or contracted contemporaneously with the pledge, and to secure future loans by the pledgee to the pledgor (up to the limits of the pledge). The pledge privilege has been held to be effective against third persons as to future loans (for which the collateral mortgage note is subsequently repledged) from the date of the initial contract of pledge, as long as the parties mutually agreed in the initial contract of pledge that the pledge was to secure obligations thereafter arising and the pledges were made in good faith. [citations omitted]
To be entitled to retroactive ranking for subsequent advances to the pledgor, the pledgee must prove that:
1) The initial pledge was properly confected;
2) Each succeeding loan was specifically secured by a pledge of the instrument;
3) The parties had mutually agreed at the time of the original pledge that it would also secure any obligations or liabilities of the pledgor then existing or thereafter arising to the limit of the pledge; and
4) All of the foregoing being subject to the pledged instrument continuously remaining in the hands of the pledgee and the parties acting in good faith at all times.
New Orleans Silversmiths, Inc. v. Toups, 261 So.2d 252, 254-255 (La.App. 4th Cir.), writ denied, 262 La. 309, 263 So.2d 47 (La.1972). The agreement of the parties regarding what debt the collateral mortgage note was pledged to secure must be determined from the contract of pledge, which governs, as opposed to the collateral mortgage instrument. Bozorg, 457 So.2d at 675.
Thus, the initial question of whether loan advances by GECCAF are preferentially secured requires an interpretation of the collateral pledge agreement between Prevost and Borg-Warner. To prevail, GECCAF must first prove either that it is the same legal entity as Borg-Warner, or that under the terms of the collateral pledge agreement between Prevost and Borg-Warner, *1140 the pledge of the collateral mortgage note was intended to secure future advances by Borg-Warner's successors and assigns.
GECCAF contends it is a corporate successor of Borg-Warner, as opposed to being a subsequent assignee creditor, and argues that Borg-Warner and GECCAF are the same lending entity. Despite the documents entitled "General Bill of Sale and Assignment," which transferred Borg-Warner's assets to BW Twenty-Six and then to BWAC Sub-Three, GECCAF argues on appeal that no sale ever took place, and contends that it was a tax-related corporate restructuring which involved no actual transfer of assets. We do not agree.
GECCAF's argument is inconsistent with the evidence. At trial, Transamerica Commercial Finance Corporation Vice-President Jack Wacek described the transfer of assets from BWAC to BW Twenty-Six and from BW Twenty-Six to BWAC Sub-Three as a corporate restructuring but admitted that this involved the sale of assets to another corporate entity. James Marinaro, operations manager for GECCAF, further testified that GECCAF's parent corporation, GECC, acquired Transamerica Automotive Finance Corporation through a stock purchase and that only twenty-five percent of BWAC's former employees went to work for GECCAF.
Documentary evidence also supports the conclusion that a sale occurred on October 17, 1988. Assistant Secretary Marshall E. Rosenberg of the parent TCFC certified the authenticity of certain documents relating to the transfer of assets from BWAC to BW Twenty-Six and from BW Twenty-Six to BWAC Sub-Three. These documents were attached to a three-page "Assistant Secretary's Certificate" and introduced in evidence. Included is a document entitled "General Bill of Assignment and Sale" dated October 17, 1988 which recites that Transamerica Commercial Finance Corporation, for good and valuable consideration, transfers to shareholder (defined as BW Twenty-Six) the assets and liabilities of the Auto Finance Division of Transamerica Commercial Finance Corporation. Although the certification document declared that on October 17, 1988, BWAC, BW Twenty-Six, and BWAC Sub-Three were subsidiaries of the parent Transamerica Commercial Finance Corporation, it is clear that on that date, Borg-Warner Acceptance Corporation ceased to exist as a separate legal entity.
Accordingly, we find no error in the trial court's determination that GECCAF represents a separate entity and is not entitled to avail itself of any preferential security ranking otherwise available to Borg-Warner, for loans subsequently made by GECCAF.
GECCAF next contends that under the collateral pledge agreement between Prevost and Borg-Warner, acquired through the purchase of Transamerica Automotive Finance Corporation, GECCAF has the right to secure its own future advances to Prevost under the pledged collateral mortgage note and mortgage.
The collateral pledge agreement in question provides in pertinent part as follows:
Now, in order to secure the prompt payment of all past, present, and future indebtedness of [Prevost Motors] to BORG-WARNER ACCEPTANCE CORPORATION of whatever nature or kind and whenever and however arising, together with all costs and attorney's fees incurred by BORG-WARNER ACCEPTANCE CORPORATION in case judicial proceedings are instituted by BORG-WARNER ACCEPTANCE CORPORATION to enforce the payment of the indebtedness by it to said BORG-WARNER ACCEPTANCE CORPORATION,... [Prevost Motors] does hereby pledge, pawn, and deliver unto the said BORG-WARNER ACCEPTANCE CORPORATION, its successors and assigns, the following described promissory note ...
It is apparent that where the pledge agreement refers to the debt the note was pledged to secure, the words "successors and assigns" do not appear. However, where the agreement refers to the pledgee, the words "successors and assigns" are included.
*1141 Interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046; Diefenthal v. Longue Vue Management Corp., 561 So.2d 44 (La. 1990). If the terms are clear, the court will enforce the contract as written, provided the agreement is not contrary to good morals or public policy. First National Bank v. City of New Orleans, 555 So.2d 1345 (La.1990).
The terms of the collateral pledge agreement do not satisfy the requirement that each succeeding loan be specifically secured by the pledge. Specifically, the agreement states that the collateral mortgage note was pledged to secure indebtedness to Borg-Warner Acceptance Corporation. The terms are clear, unambiguous and do not lead to absurd consequences. As written, the pledge agreement allows the original pledgee to assign the note to a subsequent pledgee to secure the existing debt without simultaneously assigning the right to secure future advances by the subsequent pledgee.
Although the trial court did not provide reasons for judgment, inferentially, the court found that the pledge agreement does not and was not intended to allow GECCAF as an assignee of debt owed to Borg-Warner to issue new loans to Prevost and be secured retroactively and by priority. This interpretation of the pledge agreement is reasonable in that it shows an intent by the pledgor to restrict the right to secure future advances to the original pledgee. We do not find that the agreement violates good morals or public policy. As appellee correctly contends in brief, the law and the nature of the pledge contract require that the debtor make his intent clear in the pledge instrument if the pledge is intended to secure other unspecified obligations for which the assignee of the pledge instrument will obtain the right to be secured for its future advances.
Thus, in the absence of proof by GECCAF that the pledge of the January 15, 1988 collateral chattel mortgage note was intended to secure any debt other than that owed to Borg-Warner, which ceased to exist on October 17, 1988, GECCAF has no right to claim a secured position in preference to Premier. Having so concluded, we pretermit a discussion of GECCAF's second assignment of error, as GECCAF was not entitled to succeed to the rights and privileges of Borg-Warner, if any, accorded by the subordination agreements in favor of Borg-Warner, for advances made by GECCAF.

GECCAF'S MOTION TO REMAND/MOTION TO STRIKE
By this motion, GECCAF seeks a remand to the trial court to adduce countervailing evidence, arguing that in its reply brief, Premier improperly referred to evidence outside of the record, which GECCAF contends prejudices its case. Alternatively, GECCAF requests that Premier's reply brief be stricken in its entirety, or that the offending portions be stricken.
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. LSA-C.C.P. art. 2164. The appellate briefs of the parties are not part of the record on appeal, and this court has no authority to consider on appeal facts referred to in appellate briefs, or in exhibits attached thereto, if those facts are not in the record on appeal. Tranum v. Hebert, 581 So.2d 1023, 1027 (La.App. 1st Cir.), writ denied, 584 So.2d 1169 (La.1991). The testimony referred to by Premier in its reply brief is not part of the record and was not considered by this court; nor did such testimony influence our decision in this case, which is based upon the clear language of the collateral pledge agreement. Neither a remand to the trial court nor an order striking the reply brief is necessary. GECCAF'S motion is denied.

CONCLUSION
We conclude, as did the trial court, that the collateral pledge agreement secures *1142 only indebtedness to Borg-Warner arising on or before October 17, 1988. To find otherwise would necessitate a modification of the clear and express terms of the pledge agreement.
Accordingly, the judgment of the trial court rendered on July 27, 1990 is hereby affirmed at appellant's costs.
AFFIRMED.
NOTES
[1] Prior to January 1, 1990, Louisiana Motor Vehicle floor plan collateral chattel mortgages were subject to LSA-R.S. 32:710, et seq. Motor Vehicle floor plan security agreements are now subject to LSA-R.S. 10:9-101, Chapter 9 of the Louisiana Commercial Laws.
[2] Mortgages generally rank in priority from date of recordation. LSA-C.C. art. 3329 provides that among creditors, the mortgage, whether conventional, legal or judicial, has force only from the time of recording it in the manner directed by law.
[3] A petition for intervention was also filed on behalf of Volkswagen of America on June 11, 1990. However, the Volkswagen intervention is not a part of the appeal and this party is not before us.
[4] See LSA-C.C.P. art. 2643.
[5] On September 12, 1990, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed against Prevost Motors, Inc. By joint motion of the bankruptcy trustee and GECCAF, an order was rendered lifting the stay of proceedings and allowing GECCAF to prosecute the appeal in these proceedings. See In Re: Prevost Motors, Inc., U.S. Bankr.Ct., M.D.La., No. 90-01125.
[6] All indebtedness arising from loans by Borg-Warner Acceptance Corporation has been paid. This appeal concerns only whether loans by GECCAF are secured by the mortgage and pledge agreement granted in favor of Borg-Warner.