654 So.2d 800 (1995)
Heman LeBLANC, Jr.
v.
CAJUN PAINTING INC., and Aetna Life and Casualty Co.
No. 94 CA 1609.
Court of Appeal of Louisiana, First Circuit.
April 7, 1995.
Rehearing Denied June 6, 1995.
*802 Robert E. Kleinpeter, Baton Rouge, for plaintiff-appellantHeman LeBlanc, Jr.
Henry G. Terhoeve, Baton Rouge, for defendant-appellants Cajun Painting and Aetna Life and Cas. Co.
Errol J. King, Jr., Baton Rouge, for intervenor-appellee Louisiana Cardiology Associates.
Before LeBLANC, PITCHER and FITZSIMMONS, JJ.
FITZSIMMONS, Judge.
The primary issue in this worker's compensation claim is whether the claimant-worker, Mr. Herman LeBlanc, Jr., met his burden of proving that the work injury caused his medical disability. We find no manifest error in the hearing officer's findings that claimant, Mr. LeBlanc, did prove the work injury on May 23, 1989 caused his peripheral sensory neuropathies and toxic encephalopathy and that Mr. LeBlanc was permanently and totally disabled. We affirm the judgment of the hearing officer on those issues. However, we reverse (1) the finding that the worker's compensation insurer, Aetna Life and Casualty Company (Aetna), was arbitrary and capricious in terminating benefits, (2) the award of penalties and attorney's fees, (3) the order of the reimbursement of medical expenses to the intervenor, Louisiana Cardiology Associates (LCA), and (4) the award of compensation benefits for the period Mr. LeBlanc worked between July, 1989 and April, 1990.

*803 FACTS AND PROCEDURAL BACKGROUND
Mr. Herman LeBlanc filed a disputed claim for compensation with the worker's compensation office. The matter was heard in February of 1991 and December of 1992. Before the injury on the job, Cajun Painting, Inc. (Cajun), employed Mr. LeBlanc, off and on, as a painter and sandblaster for approximately 10 years. Cajun filed for bankruptcy after this appeal was taken. The bankruptcy court granted relief from an automatic stay so that the suit and appeal could continue. No judgment, however, can be taken against Cajun. Aetna was the worker's compensation insurer for Cajun. LCA, Mr. LeBlanc's health insurer, intervened in the disputed compensation claim, and asked for reimbursement of medical expenses it paid on behalf of Mr. LeBlanc.
Throughout the employment with Cajun, Mr. LeBlanc was exposed to various chemicals, toxic and non-toxic. He had not experienced any significant related health problem before the work injury. On May 23, 1989, Mr. LeBlanc was sandblasting for Cajun. Mr. LeBlanc was breathing air from an air compressor through a mask. To be used as a source of breathable air, the air compressor should have had a specific type of filter. Mr. LeBlanc testified that the filter was missing that day. The air compressor was also the source of air for the sandblasting equipment.
Mr. LeBlanc testified that, after the first few minutes on the machine, Mr. LeBlanc smelled something like silicone glue. Silicone glue usually contains a solvent that can be toxic. The manufacture of silicone also involves toxic chemicals. After smelling the odor, Mr. LeBlanc experienced dizziness, weakness, and blurred vision. Mr. LeBlanc notified his foreman of the problem, but was told to continue working or "hit the gate." The day before, another employee, Paul James, experienced dizziness and nausea after about forty-five minutes of breathing air from the same compressor. Mr. James stopped using that compressor and the symptoms resolved within a couple of hours.
After four hours on the compressor, Mr. LeBlanc's prior symptoms worsened. He also experienced numbness of the face, a burning sensation in the eyes, and anxiety. The foreman realized Mr. LeBlanc was ill and told him to lay down in the supervisor's shack. Mr. LeBlanc fell asleep immediately and did not wake until he was told it was quitting time. He awoke with a headache and the same earlier symptoms.
At home, he experienced fatigue and a racing heart. The symptoms continued throughout the night. Mr. LeBlanc went to the emergency room at Our Lady of the Lake in Baton Rouge, the next morning.
Mr. LeBlanc's emergency room chart recorded the symptoms, but did not specifically mention a work-related injury. Dr. John Fraiche, a family physician, examined Mr. LeBlanc at the hospital. Dr. Fraiche's initial impression was vertigo caused by a middle ear problem of some sort. An echocardiogram done on June 1, 1989, showed no sign of mitral valve prolapse (MVP), a condition with symptoms similar to Mr. LeBlanc's. Another ECG was done on June 20, 1989, and mild MVP was noted by the hospital cardiologist.
The symptoms persisted. Dr. Fraiche referred Mr. LeBlanc to Dr. Thomas Hansbrough, an otolaryngologist. Mr. LeBlanc reported the inhalation incident at work and his continuing symptoms. Objective testing showed central vestibular nerve pathway abnormality. In a letter dated June 28, 1989, Dr. Hansbrough diagnosed vertigo secondary to central vestibular dysfunction, a type of peripheral nerve system damage. Dr. Hansbrough referred Mr. LeBlanc to Dr. Susan Joerns, a neurologist, for a neurological evaluation.
At the time of Mr. LeBlanc's visit to Dr. Joerns in June of 1989, Mr. LeBlanc reported numbness in the body (especially in the fingers), blurred vision, episodes of tunnel vision and flashing lights, nausea, heart palpitations, dizziness and anxiety. Dr. Joerns found fluctuating anisocoria (a condition where the pupils dilate unevenly when exposed to light, a sign of possible peripheral neuropathy). Dr. Joerns diagnosed MVP, based on the ECG with positive findings and Mr. LeBlanc's symptoms.
*804 A later ECG done in 1990 by a cardiologist, Dr. Carl Luikart, showed no sign of MVP. In Dr. Luikart's opinion, Mr. LeBlanc did not have MVP.
On medication prescribed by Dr. Joerns, the dizziness resolved and the major symptoms seemed to improve. Dr. Joerns signed a release to return to work for July 3, 1989. Throughout the treatment, from June, 1989 until September of 1990, the other symptoms continued, but waxed and waned. By the time of Dr. Joerns deposition in January of 1991, Dr. Joerns had linked the inhalation to the continuing symptoms and wondered if the chemical exposure could have triggered the onset of rheumatoid arthritis in Mr. LeBlanc in 1990. However, in Dr. Joerns' opinion, without the rheumatoid arthritis, Mr. LeBlanc would still suffer from the same MVP symptoms, but could work on proper medication.
In April of 1990, Mr. LeBlanc experienced severe swelling in his joints. He was referred to a rheumatologist, Dr. Jed Morris. At the time of the hearing, Dr. Morris was still treating Mr. LeBlanc for severe rheumatoid arthritis. Dr. Morris stated in deposition that the cause for rheumatoid arthritis is unknown to the medical profession, but a genetic link is known to exist. Mr. LeBlanc tested positive for that genetic indicator. After treating Mr. LeBlanc for some time, Dr. Morris thought it was possible that toxic chemical exposure could trigger rheumatoid arthritis. However, Dr. Morris knew of no studies to support that theory. Dr. Morris testified that the effects of the peripheral nervous system dysfunction on the rheumatoid arthritis, and vice versa, could not be separated out, nor separately determined because of the similar manifestations of both conditions. He treated Mr. LeBlanc as having one illness.
Mr. LeBlanc was referred to Dr. Thomas Callender, who was board certified in internal medicine and board eligible in occupational medicine. Dr. Callender first saw Mr. LeBlanc on July 3, 1990, only two months after Dr. Morris began treating Mr. LeBlanc and approximately three months after the swelling in the joints was reported. Dr. Callender continued to treat Mr. LeBlanc throughout the time of the hearing.
Mr. LeBlanc reported the continuing symptoms of blurred vision, tunnel vision, flashing lights, anxiety, dizziness, numbness. On examination, Mr. LeBlanc exhibited loss of balance, loss of short term memory, olfactory nerve dysfunction, and central vestibular dysfunction. Based on a series of written tests, Dr. Callender found that Mr. LeBlanc experienced some brain damage. Objective testing revealed the following:
1. Current perception threshold test revealed loss of function of the right and left peroneal nerve in the legs, decrease in the left trigeminal nerve in the face, and left median nerve supplying the hand, forearm, and hand area;
2. Single Photon Emission Computerized Tomogram showed decreased blood flow to the left temporal lobe, frontal lobes, and left motor strip; and
3. Nerve biopsy showed segmental remyelination and marginal changes consistent with demyelination.
Dr. Callender also reviewed the prior medical history. Dr. Joerns had noted that Mr. LeBlanc had always been a somewhat nervous person. Before the work injury, he had experienced some "light-headedness" but had previously experienced nothing like the symptoms he had after the four hour inhalation. Also prior to the work injury, Mr. LeBlanc voluntarily entered a substance abuse rehabilitation program in 1986. By all accounts, the problem was resolved at that time, without any recorded related health problems.
Dr. Callender diagnosed peripheral sensory neuropathies and toxic encephalopathy, secondary to chemical exposure. He also believed that the toxic exposure caused or triggered the rheumatoid arthritis.
At the time of the January 19, 1991 deposition, Dr. Callender believed that the neurological conditions rendered Mr. LeBlanc 100% disabled. By the time of the July 29, 1992 deposition, Dr. Callender found it impossible to separate out the one illness, rheumatoid arthritis or neurological dysfunction, that rendered Mr. LeBlanc 100% disabled.
*805 Mrs. LeBlanc testified that she called a representative of Cajun and requested that Cajun try to determine what type of inhalant might have been emitted from the compressor. Cajun did not remember such a request. No testing for a specific emission was done at that time. The air compressor was cleaned or reworked before it could be inspected or tested by plaintiff.
Dr. Callender considered solvents, hydrocarbons, carbon monoxide, or a combination as possible candidates for the toxic inhalant. Dr. Callender testified that it was difficult to identify a toxic inhalant because they evaporate. To find the chemical in the body, specific tests for specific chemicals must be done. The tests are expensive and would not be done routinely. Without some knowledge of what might have been inhaled, a doctor does not know what specific tests to conduct. This information would have been available if the machine had been tested immediately.
When faced with an unknown toxin, Dr. Callender looks for a fingerprint of a specific type of chemical based on a review of the past medical history and the symptoms experienced after the inhalation or exposure incident. Mr. LeBlanc exhibited the classicsymptoms of neurotoxic exposure and developed shotgun pattern illness typical of exposure. Therefore, even though a specific chemical or toxin could not be identified, it was highly probable that neurological problems were caused by some type of exposure to a neurotoxic chemical, probably a solvent. Dr. Callender opined that alcohol abuse might lower an individual's resistance to toxins, but was an unlikely cause of Mr. LeBlanc's peripheral nervous system dysfunction. Mr. LeBlanc had no lasting effects from the episode of alcohol abuse and was functioning well two to three years before the May 23, 1989 incident.
Dr. R. Joseph Tamimie, board certified in occupational medicine, conducted an independent medical examination of Mr. LeBlanc. Dr. Tamimie's diagnosis of neurological dysfunction was the same as Dr. Callender's. However, because Dr. Tamimie had no objective evidence of a specific toxic inhalant, he believed that the problems were likely caused by the past alcohol abuse. When asked if it was possible for a prolonged inhalation of four hours to cause neurological dysfunction, the doctor answered affirmatively. Dr. Tamimie testified that medical literature contained no support for a finding that rheumatoid arthritis was in any way linked to or triggered by toxic chemical exposure.
In the judgment rendered May 21, 1993, the hearing officer found that Mr. LeBlanc's permanent and total disability was work-related. The hearing officer ordered the payment of permanent total benefits to Mr. LeBlanc be reinstated, including the period between July 3, 1989 and April 28, 1990, during which Mr. LeBlanc worked for another contractor. The hearing officer ordered defendants to pay reasonable medical and prescription expenses and travel expenses necessary to obtain treatment. The hearing officer also ordered reimbursement of $75,312.72 to LCA for medical expenses paid on behalf of its insured, Mr. LeBlanc. The hearing officer found Aetna arbitrary and capricious in terminating temporary total benefit payments. Based on that finding, the hearing officer awarded penalties and attorney's fees.
Aetna and Cajun appealed and assigned error to:
(1) the finding that Aetna was arbitrary and capricious,
(2) the finding of work-related permanent total disability,
(3) the order to reimburse LCA, and
(4) the award of benefits for the period Mr. LeBlanc was engaged in employment. Aetna moved to strike any information appearing in Mr. LeBlanc's briefs that was not in the record.
LeBlanc answered the appeal and assigned error to:
(1) an insufficient award of attorney's fees made for Aetna's arbitrary and capricious termination of benefits, and
(2) the hearing officer's failure to supplement the record with information discovered after the judgment.

*806 SUPPLEMENTAL INFORMATION
Plaintiff assigned error to the hearing officer's May 31, 1994 denial of plaintiff's motion to supplement the record with additional information. Plaintiff also filed a motion and order for devolutive appeal from the denial of plaintiff's motion to supplement. We view a motion to supplement as most closely akin to a post-judgment motion to correct an omission as allowed by Code of Civil Procedure articles 2088(4) and 2132. Post-judgment denials from actions under Code of Civil Procedure article 2088 are reviewable in the appeal on the merits. See Wallace v. Upjohn Company, 535 So.2d 1110, 1118 (La.App. 1st Cir.1988), writ denied, 539 So.2d 630 (La.1989).
The material plaintiff wished to have added to the record was not the supplementary material envisioned by Code of Civil Procedure articles 2088 or 2132. The information was obtained at a subsequent, independent judicial proceeding. The plaintiff established no basis for the taking of an article 1433 deposition and certainly no basis for introduction of such a deposition into the record on appeal. If plaintiff's goal was to add new evidence on the merits to the record, the motion to the hearing officer was improper. The jurisdiction of the hearing officer was divested upon the granting of the order of appeal and the timely filing of the suspensive appeal bond. See La.C.C.P. art. 2088. The denial by the hearing officer of the post-judgment motion was correct.
We find no merit in plaintiff's argument based on the continuing jurisdiction of the hearing officer under La.R.S. 23:1310.8. Section 1310.8 allows any party to apply for a modification when a change in conditions has occurred. This continuing jurisdiction appears similar to the continuing jurisdiction the trial court retains over child custody, child support, and alimony.
The right to petition for modification "is not a substitute for the appellate process." 1 Wex S. Malone & H. Alston Johnson, III, Workers' Compensation Law and Practice § 284, in 13 Civil Law Treatise (3d ed. 1994). A petition for modification is not the appropriate vehicle to review a final judgment, to amend an incorrect judgment, or supplement a record on appeal. Id.
The record contains an order granting plaintiff's motion and order for appeal of the May 31, 1994 denial of plaintiff's post-judgment motion to supplement. We assume the plaintiff has abandoned that appeal because the plaintiff assigned error to the hearing officer's denial of the motion to supplement in plaintiff's answer to the appeal.
Aetna and Cajun filed a motion to strike and for sanctions because plaintiff included in his brief new, supplemental material obtained from a subsequent, independent judicial proceeding.
Our decision in this case rests on our review of the record containing evidence and exhibits properly submitted during the hearing below. We did not consider any alleged facts offered in the briefs that were not offered or considered at the hearing. The few references to information discovered in an independent proceeding after the judgment was rendered are to be considered as stricken from the brief. See Premier Bank v. Prevost Motors, 597 So.2d 1136 (La.App. 1st Cir.), writ denied, 605 So.2d 1115 (La. 1992). The striking of portions of the brief serves as a sufficient sanction under these circumstances.

CAUSATION
A claimant has the burden of proving, by a preponderance of the evidence, that a work-related accident either caused or contributed to the disability. It is not necessary that the exact cause be found. Thomas v. Tony's Seafood, Ltd., 633 So.2d 675, 677 (La.App. 1st Cir.1993), writ denied, 94-0223 (La. 3/18/94), 634 So.2d 856; Patterson v. GNB Battery, Inc., 569 So.2d 640, 642 (La.App.2d Cir.1990), writ denied, 573 So.2d 1134 (La.1991). The work-related accident need not be the sole cause of the disability. Stewart v. Louisiana Plant Service, Inc., 611 So.2d 682, 688 (La.App. 4th Cir.1992), writ denied, 616 So.2d 706 (La.1993). The claimant's uncontradicted testimony, corroborated by medical evidence, can be used to prove the work-related accident. The consequences of a work-related disability are not *807 always fully apparent at the time the accident occurs. Nelson v. Roadway Express, Inc., 588 So.2d 350, 353 (La.1991).
The disability is presumed to be the result of the work-related accident, if the claimant was in good health before the accident and the symptoms of the disability appear after the accident and continue to manifest themselves. This presumption is available providing that sufficient medical evidence is introduced to show a reasonable possibility of a causal connection between the disability and the work-related accident, or that the nature of the accident raises a natural inference that such a causal connection exists. Thomas, 633 So.2d at 677; Patterson, 569 So.2d at 642. If the evidence is evenly balanced, or shows only a possibility that a work-related event produced the disability, or "leaves the question open to speculation or conjecture," the claimant fails to carry the burden of proof. Thomas, 633 So.2d at 677; Dunckelman v. T. Baker Smith & Sons, Inc., 447 So.2d 26, 28 (La.App. 1st Cir.1984); Loyd v. IMC Fertilizer, Inc., 557 So.2d 1078, 1081 (La.App.2d Cir.), writ denied, 561 So.2d 102 (La.1990).
Ultimately, the question of disability is a question of fact. The appellate court cannot set aside a finding of fact in the absence of manifest error. Thomas, 633 So.2d at 677.
Based on (1) the fairly healthy state of Mr. LeBlanc before the accident, (2) the consistent, recurring symptoms typical of neurological dysfunction that were identified before the onset of rheumatoid arthritis, and (3) the diagnosis of neurological dysfunctions by Doctors Callender and Tamimie, we find no error in the hearing officer's finding that Mr. LeBlanc suffered from toxic encephalopathy and peripheral sensory neuropathies as a result of the May 23, 1989 incident at work.
The record contains no empirical data, articles or scientific studies, to support a finding that toxic inhalation or exposure could cause or trigger rheumatoid arthritis. The treating rheumatologist stated that the cause of rheumatoid arthritis is unknown to medical science, but a genetic factor is thought to exist. Mr. LeBlanc possesses that genetic indicator. Only Dr. Callender opined that the inhalation caused or triggered rheumatoid arthritis, but provided no basis for that opinion. Thus, Dr. Callender posited pure medical speculation. Dr. Joerns and Dr. Morris merely wondered out loud if a chemical or toxic trigger was possible. This medical testimony was also mere conjecture and speculative at best. Dr. Tamimie testified, as did Dr. Morris, that toxic inhalation had not been determined to be a cause of rheumatoid arthritis. Any finding that the toxic inhalation incident caused rheumatoid arthritis was clearly erroneous.
No one disputes that Mr. LeBlanc is now permanently and totally disabled. The question is whether the work-related injury, the neurological conditions and dysfunctions, contributed to Mr. LeBlanc's permanent and total disability.
Doctors Morris and Callender found it impossible, as the rheumatoid arthritis progressed, to distinguish the effects of the arthritis from the symptoms and effects of the neurological problems. Earlier in the progression of the rheumatoid arthritis, Dr. Callender believed that the neurological problems caused Mr. LeBlanc's total disability. The rheumatoid arthritis and the work-related neurological conditions could be concurrent causes of the disability to work. Certainly, the onset of the arthritis made it impossible to determine whether the neurological problems would have improved over time or continued to worsen. After a thorough review of the record, especially the voluminous medical evidence submitted, we cannot say that the hearing officer committed manifest error in finding that the work-related injury, the peripheral sensory neuropathies and toxic encephalopathy, contributed to the permanent and total disability.
Therefore, we affirm the judgment of the hearing officer finding Mr. LeBlanc permanently and totally disabled by a work accident and affirm the award of compensation benefits from the date he stopped working in April of 1990.

*808 COMPENSATION BENEFITS WHILE EMPLOYED
After Mr. LeBlanc's treating physician, Dr. Joerns, signed a release to return to work on July 3, 1989, Aetna discontinued the compensation benefits. Mr. LeBlanc worked fairly regularly from July 3, 1989 until April 28, 1990. Another treating physician told Mr. LeBlanc to stop working because of the complications from the onset of the rheumatoid arthritis.
Although Mr. LeBlanc's dizziness improved for a time during the period in question, his other symptoms continued. Mr. LeBlanc was required to take medication for these other problems and continued to see his treating physicians during this working period. For these reasons, the hearing officer awarded temporary total benefits to Mr. LeBlanc for the time he was working from July, 1989 until April of 1990.
The hearing officer erred in awarding benefits during the period Mr. LeBlanc worked. The 1983 and 1988 amendments to La.R.S. 23:1221 precluded any finding of temporary or permanent total disability while Mr. LeBlanc engaged in any type of employment, even under the difficult circumstances here. See La.R.S. 23:1221(1)(b) & (2)(b). Mr. LeBlanc did not argue that SEB payments were owed. Therefore, we reverse the award of compensation benefits from July 3, 1989 until April 28, 1990, and amend the judgment accordingly.

REIMBURSEMENT OF MEDICAL EXPENSES
The hearing officer erred in his award of $75,312.72 to intervenor, LCA, as reimbursement for medical bills paid by LCA. The right to medical expenses is personal to the injured employee. Bradley v. Arnold Lege Alligator Farm, 625 So.2d 591, 597 (La.App. 3d Cir.1993); Physicians and Surgeons Hospital, Inc. v. Leone, 399 So.2d 806, 807 (La.App. 3d Cir.), writ denied, 401 So.2d 993 (La.1981). Charity hospitals are granted an exception by law to intervene for reimbursement. See La.R.S. 46:11.1 & 13; 1 Wex S. Malone & H. Alston Johnson, III, Workers' Compensation Law and Practice § 287, in 13 Civil Law Treatise (3d. ed. 1994). LCA cites no article that would entitle it to reimbursement. La.R.S. 23:1212, effective January 1, 1990 is inapposite. It provides an offset to the compensation insurer, not reimbursement to the health insurer.
La.R.S. 23:1203A entitles a claimant to payment of necessary medical expenses. Claimant must prove that the disability was related to the work accident, and that the doctor was treating the claimant for that disability. The claimant must show the necessity and relationship of the treatment to the work-related accident. Tanner v. International Maintenance Corp., 602 So.2d 1133, 1138-39 (La.App. 1st Cir.1992). The hearing officer obviously found that the medical expenses were necessary and related to the disability caused by the accident at work.
We find no manifest error in any award to Mr. LeBlanc for unpaid medical bills submitted at the hearing. Dr. Callender testified that the inhalation, exposure incident caused the neurological problems. Dr. Callender was treating Mr. LeBlanc for those problems. Dr. Morris testified that he treated Mr. LeBlanc as if he had one illness because the effects and symptoms of the neurological disorders and the rheumatoid arthritis were impossible to separate or distinguish. Mr. LeBlanc submitted bills and prescriptions from Doctors Morris and Callender.
The provisions of La.R.S. 23:1142, requiring approval from the compensation insurer or employer before health care fees will be paid, do not apply to Mr. LeBlanc's case. Aetna and Cajun denied that the neurological problems and the rheumatoid arthritis were compensable under worker's compensation provisions. La.R.S.23:1142E.

ARBITRARY AND CAPRICIOUS
If the decision not to pay compensation timely is arbitrary, capricious, or without probable cause, the insurer is subject to penalties and attorney's fees. La.R.S. 23:1201E & 1201.2. An employer's reliance on a treating physician's release to return to work as a basis for terminating benefits cannot be considered arbitrary or capricious. *809 Rogers v. Pizza Hut, 547 So.2d 1092, 1095 (La.App. 1st Cir.), writ denied, 552 So.2d 384 (La.1989). An employer's termination of benefits may be considered arbitrary when it appears that further medical information is required to make an exact determination of the employee's condition. Id. The mere fact that an employer or compensation insurer decides to take the disability issue to court, and loses, does not mean the insurer was necessarily arbitrary, capricious, or without probable cause to terminate or refuse to reinstate benefits. See Schmidt v. Atlas Erection Company, Inc., 487 So.2d 112, 115 (La.App. 4th Cir.), writ denied, 493 So.2d 640 (La.1986).
Mr. LeBlanc was released by his treating physician to return to work on July 3, 1989. He worked until late April of 1990. Aetna terminated benefits on July 3, 1989, and relied on Dr. Joerns belief that Mr. LeBlanc could work, if properly medicated. Besides monitoring Mr. LeBlanc's condition and medication, Dr. Joerns did not feel any further evaluation was necessary. Until the onset of the rheumatoid arthritis, no physician fully evaluated the disability.
Because of the work release, the complex nature of Mr. LeBlanc's medical problems, the difficulty in separating the problems associated with rheumatoid arthritis from the symptoms of peripheral nervous system dysfunction and toxic encephalopathy, and the differing medical opinions on causation and disability, we find that the hearing officer erred in finding Aetna arbitrary and capricious. The reliance on Dr. Joerns opinion, and disregard of Dr. Callender's opinion, does not translate into arbitrary and capricious. See Schmidt, 487 So.2d at 115. We reverse the arbitrary and capricious finding in the judgment as well as the award of penalties and attorney's fees.

CONCLUSION
For the foregoing reasons, we reverse the judgment of the hearing officer holding Aetna arbitrary and capricious for terminating benefits, ordering penalties and attorney's fees, ordering benefit payments during the period Mr. LeBlanc was employed from July 3, 1989 through April 28, 1990, and ordering reimbursement to LCA for medical expenses paid on behalf of its insured, Mr. LeBlanc. We affirm the judgment of the hearing officer in all other respects. The cost of the appeal is assessed to defendant-appellant, Aetna.
REVERSED IN PART AND AFFIRMED IN PART.